# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**RICHARD ANDERSON,** *et al.*,        )
)
       **Plaintiffs,**         )
)
    **v.**              )       **Civil Action No. 06-1565 (RMC)**
)
**ARNE DUNCAN,** *in his official capacity* )
*as the Secretary of the U.S. Department of* )
*Education*,              )
)
       **Defendant.**         )
_____)

## MEMORANDUM OPINION

This protracted litigation presents two novel legal issues concerning application of the Rehabilitation Act and the Age Discrimination in Employment Act to a federal employer. Over seven years ago, the regional offices of the Rehabilitation Services Administration, a division within the Department of Education, were defunded by the White House budget for fiscal year 2006, which led to office closings and consolidation into the Department's Washington, D.C., headquarters. Disabled and older employees in the regional offices lost their jobs and sued. The subsequent litigation resulted in lengthy discovery, and now, cross-motions for partial summary judgment on Plaintiffs' disparate impact theories of liability. Plaintiffs single out the decision to defund the regional offices, claiming that it constituted age and disability discrimination because of its disparate impact on older and disabled employees. In doing so, Plaintiffs challenge a management decision by officials in the Executive Branch that was designed to achieve a centralized organizational structure, direct supervision, and cost

savings, and accordingly is protected by the "business necessity" test. Partial summary judgment will be entered in favor of the Secretary of Education.

## I. FACTS

Eighteen current and former employees of the Rehabilitation Services Administration (RSA), a division of the Department of Education's Office of Special Education and Rehabilitative Services (OSERS), filed this suit against Secretary Margaret Spellings in her official capacity.[1] *See* Compl. [Dkt. 1]. Richard Anderson, Bryan Bashin, Joseph Cordova, Loerance Deaver, Michael Evans, Joseph Farrell, Marian Fuller, Martha Garber, Diana Koreski, Seymour Levy, Jeffrey Mitchell, John Nelson, Kathleen Niemi, Noel Nightingale, Ralph Pacinelli, Bruce Rose, Janette Shell, and Jacquelyn Tellier (collectively, Plaintiffs)[2] assert various claims against the Secretary in connection with the decision to cut funding for RSA's regional offices. *Id.* ¶¶ 1-12. The cross-motions for partial summary judgment address one of Plaintiffs' theories of liability as to the Secretary's alleged discrimination on the basis of disability, in violation of the Rehabilitation Act of 1973 as amended (Rehab Act), 29 U.S.C. § 701 *et seq.*, and on the basis of age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.* The relevant material facts are undisputed.

### A. Organizational Structure of RSA

The Department of Education (Department) is a multilayered agency comprised of several principal offices and nine program offices. OSERS is a program office charged with

---

[1] Arne Duncan was sworn in as Secretary of the Department of Education (Department) in January 2009; he is automatically substituted for former Secretary Spellings. *See* Fed. R. Civ. P. 25(d).

[2] Former Plaintiff Charles Linster withdrew on August 25, 2009. *See* Aug. 25, 2009 Minute Order.

implementing programs that support individuals with disabilities. OSERS has three components, of which RSA is one. *See* Def.'s Reply [Dkt. 88], Ex. 22 [Dkt. 89-5] at 1-2.

As its name implies, Congress established RSA to implement statutory provisions relating to individuals with disabilities. Def.'s Mot. Summ. J. [Dkt. 75], Ex. 6 [Dkt. 76-7] at Attach. C. With the stated mission of "provid[ing] leadership and resources to assist state and other agencies in providing vocational rehabilitation . . . , independent living . . . and other services to individuals with disabilities to maximize their employment, independence, and integration into the community and the competitive labor market," Pls.' Mot. Summ. J. [Dkt. 74-1], Ex. 2 [Dkt. 74-5] at 1, RSA oversees grant programs to state agencies that provide direct vocational rehabilitation services to individuals, *id.*, Ex. 1 [Dkt. 74-4] at 1. Prior to October 1, 2005, RSA maintained ten regional offices. *See id.*, Ex. 6 [Dkt. 74-9]. No other division within OSERS operated regional offices. Def.'s Mot. Summ. J. ¶¶ 24-25. Today, only the Department's Office of the Inspector General, Office of Civil Rights, and Office of Federal Student Aid maintain regional offices. Def.'s Reply ¶ 3.

**B. Decision to Defund RSA Regional Offices**

In February 2005, President George W. Bush released his fiscal year 2006 budget proposal (FY06 budget) for the federal government. With respect to the Department, the FY06 budget reflected a slight decrease in funding for full-time equivalent (FTE) positions. Def.'s Mot. Summ. J., Ex. 1 [Dkt. 76-2] at X-2. The reduction in FTE stemmed from changes in several of the Department's principal offices, including OSERS. The FY06 budget specified that OSERS would achieve a net decrease of 66 FTE through the consolidation of RSA regional offices into headquarters. *Id.* at X-3.

Reorganizing RSA by ending funding for regional offices and consolidating them into headquarters was not a novel idea. Regional offices for other programs in the Department had been eliminated in the past, and prior administrations had considered consolidating RSA.[3] Pls.' Mot. Summ. J., Ex. 29 (Dep. of Edward Anthony, delegated authority to perform functions of RSA Commissioner) [Dkt. 74-32] at 43; Def.'s Reply, Ex. 27 [Dkt. 89-10] at 2. Within the Bush Administration, the idea was considered as early as 2001 by Troy Justesen[4] and C. Todd Jones, who at that time were both assigned to the White House Task Force on Special Education. Pls.' Mot. Summ. J ¶ 37; *id.*, Ex. 27 (Dep. of Troy Justesen) [Dkt. 74-30] at 59-60.

In 2004, the idea picked up steam. Mr. Justesen was then serving as the Deputy Commissioner of RSA and Acting Deputy Assistant Secretary for OSERS. Pls.' Opp'n [Dkt. 82] ¶ 10. He presented the idea to the White House Domestic Policy Council, which included future Secretary Spellings, as a way to achieve efficiency through centralization in accord with how the Bush Administration managed other programs. *Id.*; Def.'s Mot. Summ. J. ¶ 5; *id.*, Ex. 2 (Dep. of

---

[3] It appears that at least one study was commissioned in the 1990s on the issue of consolidating RSA. According to Plaintiffs' testimony, that study ultimately recommended against eliminating RSA regional offices. Pls.' Mot. Summ. J., Ex. 14 (Dep. of Loerance Deaver, Plaintiff) [Dkt. 74-17] at 72-73; *Id.*, Ex. 36 (Dep. of Marian Fuller, Plaintiff) [Dkt. 74-39] at 30-31.

[4] Mr. Justesen has held numerous positions within the White House and Department. From 2002 to 2003, he staffed the White House's Domestic Policy Council, serving as the Associate Director for Domestic Policy and Associate Director for Native American Policy Issues. Mr. Justesen became the Deputy Commissioner of RSA in October 2003, while at the same time serving as the Acting Deputy Assistant Secretary for OSERS. For eleven months in 2004, Mr. Justesen was delegated the authority to perform the functions of the Assistant Secretary of OSERS as well. In March 2005, Mr. Justesen began serving as the Acting Commissioner of RSA. Two months later, in May 2005, he was named the Acting Director of the Office of Special Education Programs (OSEP), and officially became the Deputy Assistant Secretary of OSERS the next month. Troy Justesen Biography, Archive of Resources for President George W. Bush's Leadership Team, http://georgewbush-whitehouse.archives.gov/results/leadership/bio_960.html (last visited September 26, 2013). To minimize confusion, the Court will refer to Mr. Justesen by his last name rather than his assorted titles unless Mr. Justesen's title is particularly relevant to the issue under discussion.

David Dunn, senior education advisor to President Bush) [Dkt. 76-3] at 22, 26-28; *id.*, Ex. 3 (Dep. of Secretary Spellings) [Dkt. 76-4] at 51. At some point, the idea was "vetted by the Secretary's office" and presented to the Office of Management and Budget (OMB) during an October 2004 meeting concerning the Department's preliminary budget for fiscal year 2006. Justesen Dep. at 105-06. At the suggestion of Mr. Jones, who was then serving as the Department's Associate Deputy Secretary for Budget, *id.* at 108; Pls.' Mot. Summ. J. ¶ 38, Mr. Justesen suggested to OMB that closing RSA regional offices would result in savings that could fund other programmatic initiatives, *id.*, Ex. 28 (Dep. of Carol Cichowski, official with Department's Budget Service) [Dkt. 74-31] at 38-39.[5]

By December 2004, the Administration had decided to defund RSA regional offices in its FY06 budget, *id.*, Ex. 30 (Dep. of John Hager, Assistant Secretary for OSERS) [Dkt. 74-33] at 28; *id.*, Ex. 31 [Dkt. 74-34] at 1, although the RSA Commissioner was not informed until January 2005, *id.*, Ex. 33 (Dep. of Joanne Wilson, RSA Commissioner) [Dkt. 74-36] at 19-20. As of December 2004, RSA's ten regional offices employed sixty-five individuals on a full-time basis and two assistive readers with conditional appointments. *See id.*, Ex. 7 [Dkt. 74-10]; *id.* ¶ 6. The Department was aware that twenty-five of the full-time employees were disabled, *see id.* ¶ 10, and fifty-eight would be over the age of forty by the end of 2004, *see id.* ¶ 11.

Although the FY06 budget was not set for release until February 2005, OSERS executive leadership learned in late January that some RSA regional offices already had informed their staff of the planned closures, prompting staff members to call human resources

---

[5] The savings ultimately achieved through consolidation was calculated to be "approximately $7.6 million, including $6.5 million from a reduction of 66 FTEs and $1.1 million in savings from rent, information technology, and other overhead." Def.'s Mot. Summ. J., Ex. 20 [Dkt. 76-22] at 5.

offices for information.  *Id.*, Ex. 23 [Dkt. 74-26] at 3.  As a result, OSERS prepared an email to inform RSA staff of the reorganization before the FY06 budget was released.  In a January 29, 2005 email concerning the latest draft of the RSA staff notice, OSERS Executive Officer Andrew Pepin wrote to several OSERS officials, including Assistant Secretary Hager and Mr. Justesen, and asked whether the email notice should mention that the consolidation was part of the FY06 budget.  He noted that "[a]t this stage [the budget] is out anyway among many folks and by February 7 everyone will know about it anyway," and suggested that "[t]his has to be introduced . . . [as] something the Administration supports for positive reasons which all of you will think up on Monday."  *Id.* at 1.  Mr. Justesen responded on the same day, opining: "[W]e should not mention the budget—they don't like us to even mention budget issues before the public date.  I think we should treat this as an Administration/Hager action to improve management and not even tie it to the budget in an email."  *Id.*  Three days later, on February 1, 2005, the RSA Commissioner sent an email to all RSA staff announcing the consolidation.  *Id.*, Ex. 11 [Dkt.74-14] at 1.  In her email, the Commissioner stated that the reorganization would streamline resources and ensure uniform implementation of programs, *id.*, and during a subsequent conference call with union officials representing the affected workforce, Assistant Secretary Hager explained the consolidation as "a straight business decision," Def.'s Mot. Summ. J., Ex. 4 [Dk.76-5] at 10.

### C.  Communication of the Consolidation to the Relevant Stakeholders

Released in February 2005, the FY06 budget provided, as relevant:

Office of Special Education and Rehabilitative Services – a net decrease of 66 FTE resulting from the consolidation of the functions of the regional offices of the . . . RSA . . . into the central office and the reallocation of staff to reflect program workload. Analysis of 2004 workload data . . . shows that 81.5 FTE have been working directly on the Rehabilitation Services State Grant

> programs while other similar, but larger, formula grants
> administered by the Department are operating with 50 to 70
> percent fewer staff. (Other HQ staff work indirectly on these
> programs.) RSA is the only office within the Department that
> manages State formula grant programs from the regional offices.
> The consolidation of the regional offices' functions into the central
> office and the reallocation of staff will result both in staffing levels
> more comparable to other Department offices and in improvements
> in the administration of the Vocational Rehabilitation program
> through greater program efficiencies, consistent program
> implementation, and integrated program planning.

*Id.*, Ex. 1 at X-3. Following the release of the FY06 budget, the Department explained the

decision to defund RSA regional offices to Congress and RSA staff.

Congress asked Secretary Spellings, who had assumed that office in January

2005, for more information on the reorganization, expressing concern that the office closures

would have a deleterious effect on RSA programs. Pls.' Mot. Summ. J, Ex. 38 [Dkt. 74-41] at 1;

*see also id.*, Ex. 39 [Dkt. 74-42] at 189; *id.*, Ex. 40 [Dkt. 74-43] at 289. In a letter dated April 8,

2005, Secretary Spellings explained that advancements in electronic communications and data

technologies had rendered RSA regional offices an inefficient use of resources. She stated that

reorganization also would rectify two issues with the RSA regional offices: (1) difficulties with

issuing timely reports on monitoring state agencies; and (2) overstaffing as shown by a

workforce analysis, especially in comparison to such programs as the IDEA Special Education

Grants to States, 20 U.S.C. § 1411, which had a federal appropriation several times larger than

the RSA State Grants program but approximately fifty percent fewer assigned FTE. *See id.*, Ex.

41 [Dkt. 74-44].[6] Thus, by centralizing RSA programs—as "nearly all Education Department

_____

[6] RSA Regional Commissioners objected to Secretary Spelling's rationale for closing the
regional offices in a letter to the RSA Commissioner. They attributed RSA's inability to issue
timely monitoring reports to OSERS's changes in requirements for the reports and new policies

programs" had been already—the Department would achieve greater coordination, accountability, and efficiency. *Id.* at 1.

OSERS's internal communications regarding the regional office closures paralleled Secretary Spelling's explanation to Congress. Agency emails and memoranda described the consolidation as a "business decision" that was the product of protracted consideration and accorded with the President's management goals for improving the performance of federal agencies. *See* Def.'s Mot. Summ. J., Ex. 5 [Dkt. 76-6] at 2 (April 1, 2005 email from Assistant Secretary Hager to RSA staff stating that consolidation was "consistent with the President's Management Agenda goals of improving the way government works and generating real results" and had been considered "for several years"); *id.*, Ex. 6 [Dkt. 76-7] at 2 (April 21, 2005 memorandum from Assistant Secretary Hager to the Executive Director of OSERS describing the RSA reorganization as a way "to more effectively serve the Department and align RSA in a manner that will assist [OSERS] in meeting the President's management initiatives and the Secretary's priorities"). During a telephone conference with RSA regional staff on March 8, 2005, Mr. Justesen responded to a question concerning a prior meeting at which Assistant Secretary Hager had promised to disseminate the plan on which the RSA reorganization was based. Mr. Justesen stated that, to his knowledge, no such plan existed. Pls.' Mot. Summ. J., Ex. 34 [Dkt. 74-37] at 21-24. He added that the consolidation was "purely a management decision" that did not require congressional approval and was based on a decision

---

when reviewing them. Pls.' Mot. Summ. J., Ex. 42 [Dkt. 74-45] at 1-2. The Regional Commissioners also contended that RSA grant programs could not be compared to those administered by OSEP or the Office of Elementary and Secondary Education (OESE). *Id.* at 3. They argued that OSEP's and OESE's grant programs are administered by state agencies receiving the grants for distribution to local providers under state oversight but RSA grants are distributed to state agencies that directly provide services. *Id.* at 2. In other words, "RSA monitors the compliance of direct service delivery with applicable laws, rather than monitoring a state education agency that oversees local service delivery." *Id.*

by "the entire chain of command," including OMB, on the "belief in the elected and appointed officials of [the Bush] Administration that the best manner to serve consumers under RSA [was] for a consolidation of regional functions to the central office."[7] *Id.* at 24-25. Later in that same call, OSERS' Executive Officer added that "[t]here may be a different surgical way to do this, but we're faced with the language in the President's budget which . . . . doesn't say go ahead and make surgical decisions by cutting [from other divisions]. It says by closing the regional offices." *Id.* at 39.

### D. Closure of the Regional Offices

By the beginning of March 2005, the Department was actively working to implement the FY06 budget's directive. OSERS convened a "Workplace Committee" to analyze the "work in the regions and headquarters to determine how Regional Office functions can best be consolidated into headquarters and how the RSA headquarters staff will be reorganized and re-energized to accomplish these functions." *Id.*, Ex. 74 [Dkt. 74-77] at 1. As Acting Commissioner of RSA, Mr. Justesen started weighing reassignment options. In a March 7 email, he asked Acting RSA Deputy Commissioner Jennifer Sheehy to "find out who exactly directly answers to the commissioner and who answers to the deputy and what [are] their essential (clearly self declared) functions of their jobs" so that he could determine where to locate those functions. *Id.*, Ex. 75 [Dkt. 74-78] at 1. Secretary Spellings requested authority from the Office

---

[7] In answering Plaintiffs' March 16, 2012 interrogatories, Secretary Duncan stated that "[t]he federal employees . . . involved in the decision to eliminate the RSA regional offices were" Secretary Spellings, Assistant Secretary Hager, Mr. Dunn, and Mr. Justesen. Def.'s Mot. Summ. J., Ex. 20 [Dkt. 76-22] at 6. Secretary Duncan also stated that the Boston Consulting Group (BCG) was not involved in the decision to defund RSA regional offices, as the parties had believed at one point in discovery, but "was involved with looking at the Department as a whole to determine how best to effectuate the Administration's program initiatives." *Id.* Secretary Duncan opined that "[t]he elimination of RSA's Regional Offices in general was in-line with BCG's overall recommendations to the Department." *Id.*

of Personnel Management (OPM) to offer 85 buyouts and 26 early outs in RSA regional offices and headquarters. Def.'s Mot. Summ. J., Ex. 7 [Dkt. 76-8] at 1; *id.*, Ex. 10 [Dkt. 76-11] at 1. RSA employed 138 people as of April 13, 2005, and the Department calculated that all but twelve RSA employees were eligible for a buyout or early out. *Id.*, Ex. 10 at 1. The Department's Office of Equal Employment Opportunity (EEO) completed an expedited review of the proposed reorganization in which it concurred with the decision but expressed "serious reservations," because "the proposed closure of . . . [RSA's] regional offices will have a disproportionate adverse impact on employees with disabilities currently employed at those offices." Pls.' Mot. Summ. J., Ex. 63 [Dkt. 74-66] at 1.

On May 10, 2005, OPM granted authority for voluntary separation incentive payments and voluntary early retirement buyouts for all RSA employees in OSERS, both regional and headquarters. *See* Def.'s Mot. Summ. J., Ex. 7. The Department's Director of Human Resources sent a memo to all RSA staff on May 20, 2005, advising them of these incentives. *See id.*, Ex. 8. In a follow up email dated May 27, 2005, Assistant Secretary Hager warned RSA staff that a Reduction in Force (RIF)—that is, involuntary separation—might be necessary if there were not enough buyouts and early outs to allow OSERS to close RSA regional offices by September 30, 2005. Pls.' Mot. Summ. J., Ex. 53 [Dkt. 74-56] at 1. A RIF proved necessary and was instituted. RSA regional offices were closed effective September 30, 2005.

### E. The Present Litigation

On September 6, 2006, Plaintiffs filed the instant, eight-count Complaint. Long and laborious discovery ensued in which both sides searched warehouses of documents and took numerous depositions covering a multitude of topics. Most relevant to the cross-motions for

partial summary judgment were the depositions of Secretary Spellings, Mr. Justesen, and Mr. Dunn. Through these depositions, Plaintiffs sought to establish that (1) the officials had an incomplete understanding of RSA regional offices' responsibilities and (2) the decision to defund RSA regional offices was based on personal belief rather than rational judgment. The record supports the first thesis if Plaintiffs, in their roles as opponents to the Department's motion and not as movants, are given the benefit of some small uncertainty in the record. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). It does not support the second.

For instance, Plaintiffs pressed Mr. Justesen on whether RSA regional offices conducted annual, on-site reviews of all state vocational rehabilitation agencies. Mr. Justesen unequivocally stated that the regional offices never performed such monitoring. Justesen Dep. at 148-49. Plaintiffs contend that the RSA *did* monitor all 80 state vocational rehabilitation agencies on an annual basis. Pls.' Mot. Summ. J. at 40. The evidence from which Plaintiffs draw support is not as clear as their argument. *See id.*, Ex. 7 (regional staffing rosters from 2004); *id.*, Ex. 8 [Dkt. 74-11] (job description of program specialist to oversee "two or more" state agencies); Ex. 9 [Dkt. 74-12] (same); Ex. 42 (no mention of number of state agencies subject to annual review); *id.*, Ex. 44 [Dkt. 74-47] (memorandum from RSA regional commissioners to state agency directors on changes to monitoring reviews without stating the number to be conducted).[8]

---

[8] Plaintiffs accuse Secretary Spellings of not "know[ing] what RSA actually does," citing her "disturbingly clear . . . testimony." Pls.' Mot. Summ. J. at 38. Plaintiffs' counsel asked Secretary Spellings about the services RSA provides to individuals (even though it does not provide such services). Contrary to Plaintiffs' argument, Secretary Spellings never agreed that RSA provides direct services to individuals. While she indicated that RSA "direct[ly]

Asked to recall the rationale for defunding RSA regional offices, each former official testified that the decision was based on a desire to serve taxpayers better by streamlining services and ensuring greater accountability and monitoring. Secretary Spellings acknowledged that the Administration did not commission any research or studies regarding the consolidation but testified that the prevailing "belief was that [they] could save money and provide high quality oversight" through centralization. *Id.*, Spellings Dep. at 116. Mr. Justesen testified that although he was "bothered" that closing the RSA regional offices could "negative[ly] impact" disabled employees, the consolidation achieved uniformity in policy implementation and what he believed was "the intent of [C]ongress" for "a better use of [RSA's] existing [salary and expenses] money . . . ."[9] Justesen Dep. at 246-47. Mr. Dunn similarly testified that "streamlining programs and providing more central control to provide greater transparency and consistency across regions" was "consistent with overall administration policy." Dunn Dep. at 28.

interface[d] with clients or customers about their needs and support services required," Secretary Spelling "use[d] that language for students [and] for school districts," because she thinks "of those as the users or clients or customers of [the Department's] services." Pls.' Mot. Summ. J., Ex. 37 (Dep. of Margaret Spellings) [Dkt. 74-40] at 55. Plaintiffs are disturbed because the former Secretary considered the Department's "clients or customers" to be students and school districts, but her phrasing did not omit students at vocational rehabilitation training programs.

[9] When Plaintiffs' Counsel probed further, the following exchange occurred:

> Q.    Is there any other way to enforce uniform policy across the country besides firing all the regional employees?
>
> A.    I don't know, and it's been six years. I don't know.

Justesen Dep. at 248. Plaintiffs urge the Court to construe this response as proof that consolidating RSA regional offices into headquarters was not necessary to achieve uniformity in policy. *See* Pls.' Mot. Summ. J. at 39. However, it is not at all clear from this exchange whether Mr. Justesen could not recall the necessity of consolidation vis-à-vis policy uniformity (*i.e.*, "it's been six years") or was admitting that the Secretary could have achieved policy uniformity through other means (*i.e.*, "I don't know."). Plaintiffs' counsel might have resolved this ambiguity by asking additional questions but did not.

Plaintiffs and the Secretary have moved for partial summary judgment. Both parties ask the Court to determine whether Plaintiffs have claims under the Rehab Act and the ADEA for disparate impact discrimination. Plaintiffs are clear that *the only adverse employment action they challenge is the decision to cut funding* for RSA regional offices and not any of the later implementation measures or impacts of that decision. Although some of the eight counts alleged in their Complaint ostensibly regard employment actions taken *after* the decision was made, Plaintiffs now expressly limit those counts insofar as they allege a disparate impact theory of liability. *See* Compl. ¶¶ 70-77. Plaintiffs insist:

> [o]nce and for all . . . [they] do not allege that the 2005 RIF had a disparate impact. Nor do [Plaintiffs] allege that the reorganization which became necessary after their jobs were eliminated had a disparate impact. *They are complaining about the fact that their jobs were eliminated in one fell swoop when funding for them was cut* from the FY2006 budget.

Pls.' Opp'n at 34-35 (internal citations omitted). Each party opposes the other's motion for partial summary judgment. For the reasons discussed below, the Court will deny Plaintiffs' motion and grant the Secretary's motion.

## II. LEGAL STANDARDS

### A. Party Standing and Federal Question Jurisdiction

This litigation has been complicated by the difficulties of necessary discovery and disputes therefrom. Despite the passage of time, Plaintiffs have standing because they have articulated an actual, concrete and particularized injury-in-fact that is fairly traceable to the Secretary's challenged action which likely will be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Envtl. (TOC) Servs.*, 528 U.S. 167, 180-81 (2000). Plaintiffs aver that the Secretary's decision to defund RSA regional offices resulted in their

retirement, buyout, or separation from federal service; they demand several remedies, including monetary damages and reinstatement. Although their current job statuses are unclear, Plaintiffs need not "maintain a concrete interest in the sought-after employment throughout all stages of the litigation." *See Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 529 (6th Cir. 2001). Further, Plaintiffs' injury-in-fact is redressable. RSA is still in operation, and there is no indication that positions comparable to those in the regional offices no longer exist at its headquarters. *See Gaddy v. Abex Corp.*, 884 F.2d 312, 319 (7th Cir. 1989) ("Reinstatement with the defendant employer is warranted absent exceptional circumstances demonstrating that the position is no longer available or where a continued reduction in forces occurs."). An injunction that requires the reinstatement of one or more Plaintiffs is a possible outcome, with or without monetary damages, should the Court find the Secretary liable. The potential for monetary damages, reinstatement, or general injunctive relief supports standing for all Plaintiffs. *See Ry. Labor Execs.' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993) (per curiam) ("[I]f one party has standing in an action, a court need not reach the issue of standing of other parties when it makes no difference to the merits of the case.").

The Court has jurisdiction over the case because it arises under federal law. *See* 28 U.S.C. § 1331. The Secretary does not dispute that Plaintiffs have exhausted their administrative remedies before the Equal Employment Opportunity Commission (EEOC). *See* 29 U.S.C. §§ 794, 794a; 42 U.S.C. 2000e-16(c); 29 C.F.R. pt. 1614.

### B. Summary Judgment

In their respective cross-motions, each party contends that it is entitled to partial summary judgment as a matter of law. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson*, 477 U.S. at 247. On summary judgment, the burden on a moving party who does not bear the ultimate burden of proof in the case may be satisfied by making an initial showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*.

The burden then shifts to the nonmovant to demonstrate the existence of a genuine issue of material fact. The nonmovant may not rest on mere allegations or denials, but must instead by affidavit or otherwise, present specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (nonmovant must present specific facts that would enable a reasonable jury to find in its favor).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, if the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Reetz v. Jackson*, 176 F.R.D. 412, 414-15 (D.D.C. 1997) (a plaintiff cannot create a genuine issue of material fact by contradicting her own deposition testimony).

## III.  ANALYSIS

### A.  Plaintiffs' Disparate Impact Theory of Rehab Act Liability

Section 501 of the Rehab Act provides the exclusive cause of action for a federal employee alleging disability discrimination by a federal agency.  29 U.S.C. § 791; *see Taylor v. Small*, 350 F.3d 1286, 1291 (D.C. Cir. 2003).  Where, as here, a complaint alleges "nonaffirmative action employment discrimination," the Rehab Act expressly incorporates Title I of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12111 *et seq.*, so that violations of the Rehab Act are judged by the standards of the ADA, *see* 29 U.S.C. § 791(g); *Taylor v. Rice*, 451 F.3d 898, 905 (D.C. Cir. 2006).[10]  Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), which includes "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability," *id.* § 12112(b)(3).  Accordingly, "[b]oth disparate-treatment and disparate-impact claims are cognizable under the ADA," *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003), and the Rehab Act.

---

[10] Section 501(g) of the Rehab Act, 29 U.S.C. § 791(g), also incorporates ADA sections 501 through 504 and 510, 42 U.S.C. §§ 12201-04 and 12210, as they relate to employment.  These provisions are not relevant to this litigation.

Claims of disparate impact are distinct from claims of disparate treatment. The latter are premised on employer action that "treats some people less favorably than others because of their race, color, religion, sex, or national origin" and require proof of discriminatory intent.[11] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Conversely, disparate impact actions "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* Such claims do not require proof that the employer had a discriminatory motive in adopting the challenged employment practice. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993).

Because the Rehab Act incorporates the ADA, which is comparable for purposes of disparate impact to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, analyzing Rehab Act claims premised on disparate impact is like unpacking a nesting doll. The analysis of a disparate impact claim under the Rehab Act requires a study of the ADA's interaction with Title VII. For purposes of disparate impact, the ADA and Title VII inquiry is similar. *See Gonzales v. City of New Braunfels*, 176 F.3d 834, 839 n.26 (5th Cir. 1999) ("Recognized as an actionable form of discrimination under Title VII, the disparate impact theory has been adopted entirely by the ADA" (citing 42 U.S.C. § 12112(b)(3) & (6)); 1 Barbara T. Lindemann et al., Employment Discrimination Law 13-200 (5th ed. 2012) ("The requirements for a prima facie disparate impact case under the ADA and Title VII are similar but not identical."). A *prima facie* case of disparate impact requires the identification of a specific employment practice that, while facially neutral, nonetheless had a disproportionate adverse effect on a protected class of individuals, and a demonstration of causation through "statistical

_____

[11] Whether Plaintiffs can assert a violation of the Rehab Act under the theory of disparate treatment is an issue which this Opinion does not resolve.

evidence of a kind and degree sufficient to show that the practice in question . . . caused" individuals to suffer the offending adverse impact "because of their membership in a protected group." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988). Once a *prima facie* case is established, the burden of production shifts to the defendant to assert, if available, a "business necessity defense."[12]

The business necessity doctrine was developed by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). Disagreeing with the Court's later narrowing of employer liability in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), Congress codified a modified version of the defense into Title VII in 1991. P.L. No. 102-166, 150 Stat. 1071; *see Smith v. City of Jackson*, 544 U.S. 228, 240 (2005). The defense is also embedded in the ADA in part. Section 12112(b)(6) of the ADA proscribes the use of:

> qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is *consistent with business necessity* . . . .

42 U.S.C. § 12112(b)(6) (emphasis added). Plaintiffs' Complaint, however, does not allege that the decision to defund RSA regional offices violated this provision, focused as it is on selection criteria, or, for that matter, any specific provision of the ADA as the Rehab Act incorporates it. *See* Def.'s Mot. Summ. J. at 25. Further, neither party argues that the "business necessity"

---

[12] Plaintiffs argue that the Secretary has waived a business necessity defense to their Rehab Act claims because the Secretary's Opposition fails to make any such argument. Plaintiffs misread the docket. The Secretary's Opposition expressly argues that "a legitimate business reason" existed "for the 2005 [r]eorganization of RSA" and incorporates in full the business necessity arguments set forth in the Secretary's own summary judgment motion. Def.'s Opp'n [Dkt. 83] at 12.

applicable to selection criteria, as codified in subsection 6 of § 12112(b), should apply

throughout subsection (b), and the Court finds no support in the law for such a construction of

the ADA as it applies to the Rehab Act.

Accordingly, the Court's analysis and application of the business necessity

doctrine will follow the *Griggs/Wards Cove* analysis.  As applied to the private sector (before the

1991 amendments to Title VII), the Supreme Court instructed that an employer must show that a

challenged employment practice "serves, in a significant way, the legitimate employment goals

of the employer."  *Wards Cove*, 490 U.S. at 659.  "The touchstone of [the business necessity]

inquiry is a reasoned review of the employer's justification for his use of the challenged practice.

. . . [T]here is no requirement that the challenged practice be 'essential' or 'indispensable' to the

employer's business to pass muster . . . ."  *Id.*  If a defendant successfully puts forward a business

necessity defense, then the plaintiff must persuade the trier of fact that alternative practices

would have achieved the same business ends without "'a similarly undesirable . . . effect'" on the

protected class of individuals.  *Id.* at 660 (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405,

425 (1975)).  Despite shifting burdens of production, the burden of persuasion remains with the

plaintiff.  *Id.* at 659.

The nature and proper application of the business necessity defense is at the heart

of the present case.  Plaintiffs contend that their statistical evidence shows adverse impact based

on disability (a point the Secretary strongly contests and which the Court does not reach[13]), but

their argument is moot if the Secretary can successfully assert a business necessity defense.

Hence, the question on which this case turns is: How does a "business necessity" defense apply

to a disparate impact claim when the federal government is the employer?  Surprisingly, there

[13] The Court therefore assumes, for purposes of deciding the Secretary's motion for partial
summary judgment, that Plaintiffs could prove an adverse impact.

appears to be no precedent on the question, and the parties avoid the issue. After expending much energy arguing over statistical analyses, they mechanically apply "business necessity" as though it has the same contours in the federal-sector as in the private-sector. The Court does not agree in full.

The Supreme Court has explained that "[p]recisely what constitutes a business necessity cannot be reduced, of course, to a scientific formula, for it necessarily involves a case-specific judgment which must take into account the nature of the particular business and job in question." *Watson*, 487 U.S. at 1005. If the "touchstone" of business necessity lies in a "reasoned review" of an employer's "legitimate employment goals," *Wards Cove*, 490 U.S. at 659, then the particular facts and circumstances of the employer must inform the analysis; what may be a reasonable and legitimate goal for one employer may not support another's actions. The need for an analysis specific to the circumstances is particularly acute when comparing private-sector employer goals with those that are legitimate for policy makers in the federal government. Although the federal government may at times *act* like a business, its undertakings generally are not directed to the maximization of profits or satisfaction of shareholders, which can be easier metrics to measure.

Hence, the alleged adverse employment action that Plaintiffs have identified informs the analysis of the Secretary's business necessity defense. The manner in which Plaintiffs have framed their motion by way of their Opposition (and thus narrowed their Complaint) is significant. They do *not* assert a typical adverse employment action for purposes of their theory of disparate impact liability, such as the way in which buyouts were offered, or the manner in which the RIF was carried out, or even the subsequent consolidation of the regional office functions into headquarters, in which the analyses for private and public

employers may be analogous.  Instead, Plaintiffs stress that the adverse action that they challenge is limited to the *decision* to defund RSA regional offices.

The Plaintiffs' construction of their disparate impact claim is important because it is clear from the uncontested facts and circumstances that the *decision* to cut funding for RSA regional offices was a high-level management judgment.  First, the multiple decision makers involved in the determination to defund RSA regional offices makes this reorganization atypical.  It was not a decision made exclusively within OSERS or even the Department, as made obvious by the fact that the RSA Commissioner was not notified of the determination until January 2005.  The decision instead was made in consultation with the White House, the Secretary, and OMB, and included in the FY06 budget.  Second, the determination to defund RSA regional offices was not driven primarily by the anticipated cost savings.  Although reflected in the FY06 budget and suggested to OMB by Mr. Justesen as a mechanism for cost reduction, the testimony from those involved in the decisionmaking process is clear that whether the closure and consolidation of RSA regional offices would actually save money was a secondary consideration.  The principal motivation for defunding RSA regional offices, and thus centralizing RSA, was the management goal of improving the performance of federal agencies, promoting efficiencies, and achieving greater supervision over the regions.

The record before the Court suggests that advocates can readily debate whether defunding RSA regional offices was the best policy for RSA.  But that is not the domain of the business necessity analysis as conceptualized by the Supreme Court.  The question in the confines of this litigation is whether, upon a "reasoned review," *Wards Cove*, 490 U.S. at 659, the decision to defund the RSA regional offices evidenced a legitimate business necessity.  "[T]here is no requirement that the challenged practice be 'essential' or 'indispensable' to the

employer's business to pass muster . . . .," *id.*, and it cannot be said that defunding RSA regional offices in order to achieve the *policy* goal of greater efficiency and central oversight was an illegitimate *employment* goal.

Plaintiffs' argument that the articulated goals of the defunding are invalid and insufficient does not alter the Court's conclusion. Plaintiffs accuse Secretary Spellings and Mr. Justesen of not understanding the functions, staffing, and importance of the regional offices. Yet, this supposed misapprehension of the duties of RSA regional offices only serves to suggest that a different decision may also have been justified, not that the preference for central oversight and reduced cost was an illegitimate judgment. Equally unpersuasive is Plaintiffs' contention that the federal government should have hired consultants and ordered longitudinal studies before acting. Just as "[t]he Constitution 'does not enact Mr. Herbert Spencer's Social Statics,'" *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2665 (2011) (quoting *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting)), neither do the Rehab Act nor the ADA require elected officials to undertake organizational analyses before implementing their management philosophies.

Similarly, the January 2005 email from Mr. Pepin, which asked senior OSERS managers to come up with "positive reasons" to tell employees for the decision to defund RSA regional offices, does not support Plaintiffs' case. Plaintiffs highlight the email as proof that the decision was made without forethought and that any rationale provided now is *post hoc* reasoning to be ignored. What is clear is that Mr. Pepin wanted to put the onus on OMB and apparently wanted some "spin" to the message to make it more palatable to RSA regional offices. Mr. Justesen's response is telling: he advised frankly informing the regions that the defunding was an "action to improve management," Ex. 23 at 1, which is exactly as Assistant

Secretary Hager described it soon thereafter, Ex. 4 at 10 ("[W]hat we're talking about is the consolidation of work at the regional office. It has nothing to do with personality. It has nothing to do with the past. . . . What it is is a straight business decision that is a way to save on overhead and to consolidate the . . . work . . . .").

In short, the way in which the decision to defund RSA regional offices developed (*i.e.*, vetted across agencies and ratified by high-ranking Executive Branch officials) and its purpose (*i.e.*, streamlining an agency program to gain greater efficiency and central oversight, reflecting the operation of other agency programs) demonstrates that Plaintiffs in actuality challenge a policy judgment. And, contrary to Plaintiffs' argument, the Secretary's business necessity defense has been consistent throughout. The only remaining question then is whether Plaintiffs can establish the existence of alternatives that would have achieved the same business ends but with less impact on disabled employees. *See Smith v. City of Jackson,* 544 U.S. 228, 242 (2005) (noting that "the business necessity test . . . asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class"). Plaintiffs propose three alternatives: the Secretary could have (1) allowed telecommuting; (2) eliminated sixty-five positions across OSERS, rather than just RSA regional offices, through buyouts and attrition; or (3) identified non-essential positions and eliminated only those jobs. These suggestions, however, miss the point. Not only do they wrongly focus on the manner in which defunding was achieved, but they directly contradict the purposes of consolidation. Plaintiffs fail to explain how any of their proposed alternatives would have achieved a more efficient and streamlined RSA with greater central oversight. Each of their proposals would have maintained a dispersed RSA. Plaintiffs' perspective on how the Department could be

organized is not objectively "wrong." But the challenged decision was vested in political appointees who implemented the President's management goals, not Plaintiffs'.

Right or wrong, presidential appointees in 2004-05 believed that a dispersed RSA suffered from program inefficiencies and redundancies and that streamlining RSA would reduce these problems while affording greater supervision. Plaintiffs argue that later developments demonstrate that eliminating funding for RSA regional offices actually harmed RSA, the taxpayers who rely on its services, and disabled individuals employed in RSA regional offices. To be sure, the Court's analysis would change if the Executive had articulated arbitrary or pretextual reasons for centralizing RSA regional offices. But the Secretary did not do so here. The decision was driven by a policy judgment on how to conduct the business of the federal government. In the context of the specific facts and claims presented by the parties' motions for partial summary judgment, the Court concludes that the decision to defund RSA regional offices was a "business necessity" that served the federal government's objectives in a reasonable way, and could not have achieved those objectives in a manner that would have had less impact on disabled employees in the regional offices. The Court accordingly will enter summary judgment in favor of the Secretary with respect to Plaintiffs' allegations that there has been a violation of the Rehab Act under a disparate impact theory of liability.

**B. Plaintiffs' Disparate Impact Theory of ADEA Liability**

Plaintiffs also assert a cause of action under a disparate impact theory in violation of the ADEA. Specifically, they contend that the Secretary's decision to defund RSA regional offices had a disparate impact on regional employees forty years and older. The Secretary counters with an argument that no federal appellate court has yet addressed on its merits.

Under existing case law, it is clear that the ADEA subjects private and federal employers to disparate treatment liability, *see Aliotta v. Bair*, 614 F.3d 556, 561 (D.C. Cir. 2010), and the ADEA authorizes disparate impact claims against private employers, *see City of Jackson*, 544 US. at 239-40. The outstanding question is whether disparate impact claims against *the federal government* also are cognizable under the ADEA. The Secretary urges the Court to answer this question in the negative, as many Judges of this District have concluded. *See Allard v. Holder*, 840 F. Supp. 2d 269, 278-80 (D.D.C. 2012) (Leon, J.); *Am. Fed'n of Gov't Emps. TSA Local 1 v. Hawley*, 481 F. Supp. 2d 72, 91-92 (D.D.C. 2006) (Kollar-Kotelly, J.); *Silver v. Leavitt*, Civ. No. 05-0968, 2006 WL 626928, at *13 (D.D.C. Mar. 13, 2006) (Bates, J.); *Evans v. Atwood*, 38 F. Supp. 2d 25, 28-30 (D.D.C. 1999) (Urbina, J.). *But see Breen v. Peters*, 474 F. Supp. 2d 1, 6-7 (D.D.C. 2007) (Roberts, J.) (finding that the portion of the ADEA applicable to federal employers "encompasses both disparate treatment and disparate impact cases, as both methods of proof seek redress for illegal discrimination").

As an initial matter, the Court notes the absence of substantive analysis of this issue by the federal appellate courts. Neither the Supreme Court nor the D.C. Circuit has confronted the issue directly. *See Aliotta*, 614 F.3d at 561 n.4 (recognizing an open question as to whether federal employees may assert disparate impact claims under the ADEA, but declining to decide because plaintiffs "failed to demonstrate any adverse effect on older employees"); *Koger v. Reno*, 98 F.3d 631, 639 & n.2 (D.C. Cir. 1996) (assuming without deciding that disparate impact claims may proceed against federal employers and finding that plaintiffs could not establish a *prima facie* case of disparate impact); *Arnold v. U.S. Postal Serv.*, 863 F.2d 994, 998 (D.C. Cir. 1988) (same). Although decisions in the Ninth and Tenth Circuits have entertained claims of disparate impact against federal employers, *see Lujan v. Walters*, 813 F.2d

1051 (10th Cir. 1987); *Palmer v. United States*, 794 F.2d 534 (9th Cir. 1986), neither Circuit has

explained its analysis, *see Walters*, 813 F.2d at 1057-58; *Palmer*, 794 F.2d at 536-39.[14]  Without

clear guidance, the Court starts its analysis with language of the statute.

### 1.   *The ADEA Federal-Sector Provision*

Whether a statute provides a cause of action is a question of statutory

construction.  *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979).  Accordingly, the

appropriate starting place is the language of the ADEA.  *Barnhart v. Sigmon Coal Co.*, 534 U.S.

438, 450 (2002) ("As in all statutory construction cases, [courts] begin with the language of the

statute.").  Section 633a(a) of Title 29 of the U.S. Code is the ADEA federal-sector provision: it

states that all federal "personnel actions affecting employees or applicants for employment who

are at least 40 years of age . . . shall be made free from any discrimination based on age."  The

ADEA does not define the phrase "any discrimination based on age."[15]

Plaintiffs contend that the statute is clear on its face.  Reasoning that courts

commonly define the term "discrimination" to include both intentional *and* disparate impact

---

[14] These opinions are not binding in this jurisdiction and their precedential value is undermined because they were decided before *City of Jackson*, in which the Supreme Court analyzed the ADEA at length.  544 US. at 232-41.  The same is true of *Lumpkin v. Brown*, 898 F. Supp. 1263 (N.D. Ill. 1995), which Plaintiffs cite for its analysis of ADEA disparate impact liability against the federal government, *see id.* at 1270-71.  Indeed, Plaintiffs have identified only four decisions post-*City of Jackson*—all non-binding district court opinions—that permit ADEA claims against federal employers based on disparate impact.  *See Rucker v. Vilsack*, Civ. No. 08-6150-HO, 2009 WL 1422580 (D. Or. May 19, 2009); *Sanders v. Potter*, Civ. No. C06-1288-TSZ, 2009 WL 57540 (W.D. Wash. Jan. 8, 2009); *Breen*, 474 F. Supp. 2d (D.D.C. 2007); *Lagerstrom v. Mineta*, 408 F. Supp. 2d 1207 (D. Kan. 2006).  None of these decision substantively addressed *City of Jackson*.  *See Rucker*, 2009 WL 1422580, at *2 (omitting any discussion of *City of Jackson*); *Sanders*, 2009 WL 57540, at *12 (same); *Breen*, 474 F. Supp. 2d at 7 n.3 (limited consideration of *City of Jackson*'s applicability); *Lagerstrom*, 408 F. Supp. 2d at 1213 (indirect analysis of *City of Jackson*).

[15] Because the Court grants partial summary judgment to the Secretary on other grounds, it does not address the Secretary's further argument that the phrase "based on age" is demonstrative of Congress's intent to subject federal employers only to disparate treatment liability.

claims, *see, e.g.*, *Lagerstrom*, 408 F. Supp. 2d at 1212, Plaintiffs argue that the phrase "any discrimination based on age" must necessarily import both disparate treatment and disparate impact claims into the ADEA federal-sector provision. However, statutory construction does not occur in a vacuum, and determining whether statutory language is plain and unambiguous depends not just on the language itself but also on "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Consequently, the Court will consider the legislative history and structure of the ADEA.

### 2. *Legislative History and Structure of the ADEA*

The federal-sector provision is an add-on to the ADEA. When enacted in 1967, the ADEA applied only to private-sector employers. Congress expanded its scope in 1974 as part of a statute aimed primarily at amending the Fair Labor Standards Act (FLSA). FLSA Amendments of 1974 § 28, 88 Stat. 74. The 1974 bill made two notable changes to the ADEA: (1) it revised the ADEA's definitions of "employer" and "employee" to include state and local governments and their employees for some claims, *see* 29 U.S.C. §§ 630(b), 630(f); and (2) it inserted a separate provision adding coverage over certain federal employers, 29 U.S.C. § 633a. *See Kimel v. Fl. Bd. of Regents*, 528 U.S. 62, 68 (2000) (discussing ADEA's passage and subsequent amendment). In grafting the federal-sector provision onto the ADEA, "Congress deliberately prescribed a distinct statutory scheme applicable only to the federal sector . . . ." *Lehman v. Nakshian*, 453 U.S. 156, 166 (1981); *id.* at 166 nn. 14-15 (summarizing the legislative history of the 1974 amendments to the ADEA). Congress could have simply slotted the federal government into the existing provisions of the ADEA (as it did for state and local governments), or modeled the ADEA federal-sector provision on 29 U.S.C. § 623(a) (the private-sector

provision).  Instead, it imposed a "broad, general ban on 'discrimination based on age'" that "was patterned 'directly after'" the federal-sector discrimination ban in Title VII of the Civil Rights Act, *Gomez-Perez v. Potter*, 553 U.S. 474, 487 (2008) (quoting *Nakshian*, 453 U.S. at 167 n.15), which requires that personnel actions affecting federal employees "be made free from any discrimination based on race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-16(a).

Section 2000e-16(a) therefore is informative when interpreting the ADEA federal-sector provision.  The immediate question is to what degree.  Using a series of syllogisms,[16] Plaintiffs ask the Court to apply Title VII unquestioningly to the ADEA.  They reason that: (1) the Supreme Court has interpreted Title VII's private-sector provision, 42 U.S.C. § 2000e-2, to include disparate impact claims, *see Griggs*, 401 U.S. at 431-32; and (2) the D.C. Circuit has extended *Griggs* to federal employers in Title VII cases, *Coopersmith v. Roudebush*, 517 F.2d 818, 821 n.7 (D.C Cir. 1975); so that (3) the ADEA federal-sector provision must necessarily encompass disparate impact claims.  The hinge on which this argument rests is the traditional tenet of statutory construction that Congress is presumed to be familiar with Supreme Court precedent.  *See Gomez-Perez*, 553 U.S. at 488.  On this basis, Plaintiffs propound a second syllogism: (1) because Congress extended Title VII to cover the federal government by adding

---

[16] Although William Faulkner would appreciate the use of "a word that might cause the reader to check with a dictionary to see if it is properly used," M. Thomas Inge, Conversations with William Faulkner 71 (University Press of Mississippi 1999), the Court wishes to be more immediately helpful.  A syllogism is a:

> logical scheme or analysis of a formal argument that consists of a major premise, a minor premise, and a conclusion and that may be used either to prove a conclusion by showing that it follows from known premises or to test the truth of premises by showing what follows from them (as in 'every virtue is laudable; kindness is a virtue; therefore kindness is laudable').

Webster's Third New International Dictionary Unabridged 2315 (3d ed. 2002).

§ 2000e-16 to the statute in 1972, only one year after *Griggs*; and (2) the language of § 2000e-16 parallels § 2000e-2 by which Title VII covers the private sector; then (3) Congress must have expected that § 2000e-16 "would be interpreted in conformity with that [private-sector] precedent," *Gomez-Perez*, 553 U.S. at 488 (internal quotations and citations omitted), as indeed this Circuit did in *Coopersmith*. Plaintiffs then extrapolate one step further with yet another syllogism: (1) since the ADEA federal-sector provision was enacted three years after *Griggs*; and (2) since the language of the ADEA federal-sector provision corresponds to that used in § 2000e-16 of Title VII; then (3) Congress must have intended to subject federal employers to age-based disparate impact liability under the ADEA.[17]

Accepting Plaintiffs' textual argument would require the Court to disregard subsequent amendments to Title VII. As previously discussed, Congress amended Title VII in 1991, overruling *Wards Cove* in part, Pls.' Opp'n at 9 n.2; *see also Nakshian*, 453 U.S. at 166-

---

[17] As further evidence Plaintiffs cite an EEOC regulation, which states:

> [a]ny employment practice that adversely affects individuals within the protected age group on the basis of older age is discriminatory unless the practice is justified by a 'reasonable factor other than age.' An individual challenging the allegedly unlawful practice is responsible for isolating and identifying the specific employment practice that allegedly causes any observed statistical disparities.

29 C.F.R. § 1625.7(c). Plaintiffs identify several EEOC decisions in which the agency "applied and enforced the disparate impact theory of discrimination against the federal government, including in age cases . . . ." Pls.' Opp'n at 15. Although in appropriate circumstances deference is due to an agency's interpretation of its enabling statute, *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984), this is not such a time. First, EEOC appears to have assumed the availability of a "reasonable factor other than age" defense under the ADEA federal-sector provision, but the Court finds that assumption doubtful. *See infra* Part III.B.4. Second, concerns about sovereign immunity discussed *infra* cannot be assuaged by mere agency proclamations, for "waiver of the Federal Government's sovereign immunity must be unequivocally expressed *in statutory text* . . . ." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (emphasis added).

67.  But *Congress did not amend the ADEA*.  Plaintiffs gloss over this inconvenient

congressional silence and argue that the ADEA federal-sector provision must be construed in

strict conformity with Title VII, *as amended*.  The Court declines to do so.  However similar the

federal-sector provisions in Title VII and the ADEA may be, *see Nakshian*, 453 U.S. at 166-67

(right to trial by jury); *Gomez-Perez*, 553 U.S. at 488 (retaliation), these two statutes also have

important differences that cannot be ignored.

### 3.  *The Supreme Court's Interpretation of the ADEA*

In fact, the *differences* between the ADEA and Title VII were essential to the

holding in *City of Jackson* that age-based disparate impact claims are cognizable under the

private-sector provision of the ADEA.  *City of Jackson* noted that "the scope of disparate-impact

liability under ADEA is narrower than under Title VII" because "age, unlike race or other

classifications protected by Title VII, not uncommonly has relevance to an individual's capacity

to engage in certain types of employment."  544 U.S. at 240.  As a result, the ADEA private-

sector provision, but not the equivalent Title VII provision, permits any "otherwise prohibited"

action "where the differentiation is based on reasonable factors other than age [(RFOA)]."  29

U.S.C. § 623(f)(1).  *City of Jackson* explained that:

> [i]n most disparate-treatment cases, if an employer in fact acted on
> a factor other than age, the action would not be prohibited under
> [§ 623(a)] in the first place.  In those disparate-treatment cases, . . .
> the RFOA provision is simply unnecessary to avoid liability under
> the ADEA, since there was no prohibited action in the first
> place. . . .
>
> In disparate-impact cases, however, the allegedly "otherwise
> prohibited" activity is not based on age.  It is, accordingly, in cases
> involving disparate-impact claims that the RFOA provision plays
> its principal role by precluding liability if the adverse impact was
> attributable to a nonage factor that was "reasonable."

544 U.S. at 238-39 (internal citations omitted).  RFOA is an affirmative defense that must be proved by the employer, *see Meacham v. Knolls Atomic Power Laboratory*, 554 U.S. 84, 94 (2008), and its availability was significant to the Court's finding that the ADEA permits disparate impact liability against private-sector employers.  "Rather than support an argument that disparate impact is unavailable under the ADEA, the RFOA provision actually supports the contrary conclusion."  *City of Jackson*, 544 U.S. at 239.

### 4. *The Theory of Disparate Impact Is Unavailable Here*

Applied to the instant matter, the logic of *City of Jackson* dictates that this Court find that disparate impact claims are not cognizable under the ADEA federal-sector provision. In stark contrast to the ADEA's private-sector provision, there is no RFOA defense for the federal government provided in the statute's federal-sector provision.  From this absence, Plaintiffs argue that the ADEA federal-sector provision does not allow *any* defense to age-based disparate impact claims against the federal government.  *See* Pls.' Opp'n at 25 ("[T]he plain language of . . . [the ADEA federal-sector provision] makes the affirmative defenses available to private sector employers unavailable to federal employers like Defendant." (citing 29 U.S.C. § 633a(f) ("Any personnel action of any department, agency, or other entity referred to in [§ 633a(a)] . . . shall not be subject to, or affected by, any provision of this chapter . . . ."))).  The Court is persuaded that Plaintiffs are correct that an RFOA defense is not available to the federal government in an ADEA disparate impact case.  Section 633a(f) expressly states that personnel actions subject to the ADEA federal-sector provision are not subject to any other section of the ADEA.[18]  29 U.S.C. § 633a(f).  Because the ADEA federal-sector provision is thus "self-

_____

[18] Section 633a(f)'s limitations do not apply to §§ 626(d)(3) and 631(b).  The former, which regards discrimination in compensation, is irrelevant to this litigation, and the latter simply states that "[i]n the case of any personnel action affecting employees or applicants for employment

contained and unaffected by other sections, including those governing . . . actions against private

employers," *Nakshian*, 453 U.S. at 168, the only statutory defenses available to the federal

government are those set forth in the ADEA federal-sector provision.  In other words, none.[19]

*See* 29 U.S.C. § 633a.  Consequently, assuming Plaintiffs could bring a disparate impact claim,

an RFOA affirmative defense would not be available to the Secretary.

But Plaintiffs prove too much.  The absence of an RFOA affirmative defense, or

any other statutory defense for the federal government, undercuts their argument that the

government can be *per se* liable for the disparate impact of neutral, non-discriminatory policy

decisions.  Congress extended the ADEA to federal employees in order to place them on equal

footing with private employees, *see* Special S. Comm. on Aging, 93rd Cong., Improving the Age

Discrimination Law 17 (Comm. Print 1973) ("Federal, State, and local government employees

are not covered by [the] ADEA and it is difficult to see why one set of rules should apply to

private industry and varying standards to government."), not to prevent the federal government,

alone among covered employers, from defending its actions.

Moreover, the absence of the RFOA affirmative defense in the ADEA federal-

sector provision buttresses the sovereign immunity analysis in which this Court's colleagues

have engaged.  *See Allard*, 840 F. Supp. 2d at 280 (finding the ADEA federal-sector provision

insufficiently clear to constitute an express waiver of sovereign immunity for disparate-impact

---

which is subject to the provision of section 633a of this title, the prohibitions established in
section 633a . . . shall be limited to individuals who are at least 40 years of age."  29 U.S.C. §
631(b).

[19] The Court cannot simply import the statutory defenses from the ADEA private-sector
provision into the federal-sector provision as is permissible in the context of Title VII.  *See
George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005) ("'Title VII places the same restrictions on
federal and District of Columbia agencies as it does on private employers, and so [the Circuit]
may construe the latter provision in terms of the former.'").  Such a solution would directly
contravene § 633a(f).

claims against federal employers); *Silver*, 2006 WL 626928, at *13 (finding no waiver of the federal sovereign's immunity from disparate impact liability under ADEA, especially considering that *City of Jackson* "carefully limited its holding" to the ADEA private-sector provision). It is a bedrock principle of American law that, as Sovereign, the United States is immune from suit unless Congress has expressly waived that immunity. *See, e.g.*, *FAA v. Cooper*, 132 S.Ct. 1441, 1448 (2012) ("[A] waiver of sovereign immunity must be 'unequivocally expressed' in a statutory text." (citations omitted)). "Any ambiguities in the statutory language are to be construed in favor of immunity, so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." *Id.* (citations omitted). To find that Congress waived federal sovereign immunity here would require the Court to accept a bizarre premise: Congress subjected the United States to a theory of liability for which private employers, but not the federal government, enjoy a statutory affirmative defense, but failed to express its intent explicitly.

Plaintiffs counter that the ADEA federal-sector provision sufficiently waived federal sovereign immunity. They advocate the adoption of the Supreme Court's sovereign immunity analysis in *Gomez-Perez*. There, having found that the ADEA federal-sector provision encompasses retaliation claims against federal employers, the Supreme Court determined that the provision, which permits "[a]ny person aggrieved . . . [to] bring a civil action in any Federal district court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter," *see* 29 U.S.C. § 633a(c), "unequivocally waives sovereign immunity . . . to remedy a violation of 633a." 553 U.S. at 491. Plaintiffs correspondingly renew their textual argument, claiming that if "any discrimination" as used in the ADEA federal-sector provision is broad enough to encompass retaliation claims as in *Gomez-Perez*, then it also should

be read expansively to cover disparate impact claims. By virtue of such a reading, sovereign immunity would be waived pursuant to § 633a(c). *Cf. Forman v. Small*, 271 F.3d 285, 297 (D.C. Cir. 2001) (determining prior to *Gomez-Perez* that the ADEA waived the federal sovereign immunity for retaliation claims based "on the sweeping language used by Congress").

Plaintiffs' textual analysis does not support their sovereign immunity waiver argument. Essential to *Gomez-Perez* was the congruity between the ADEA federal-sector provision and Title VII. *See* 553 U.S. at 487-88 (emphasizing that the ADEA federal-sector provision more closely resembled § 2000e-16 of Title VII than the ADEA private-sector provision because the ADEA federal-sector provision and § 2000e-16 "contain[] a broad prohibition of 'discrimination,' rather than a list of specific prohibited practices" and "incorporate[] certain private-sector provisions but . . . not . . . the provision prohibiting retaliation in the private sector"). Yet, when *City of Jackson* considered the applicability of disparate impact liability under the ADEA private-sector provision, the Court found that the ADEA and Title VII are incongruous because the ADEA private-sector provision has a narrower scope of liability. While it is true that this conclusion turned on the presence of an RFOA defense for private-sector employers, which is not repeated for federal employers, there is no basis in law or reason for believing that Congress, having recognized the need for an RFOA affirmative defense for age claims of disparate impact, would have subjected the federal government to disparate impact liability under the ADEA *and* withheld a RFOA defense—or any other defense as Plaintiffs argue—all without expressing its intentions clearly. Agreeing with its colleagues for their reasons and these, the Court concludes that the ADEA does not permit claims of age-based disparate impact against the United States.

### 5. *The Secretary's Motion Succeeds Even If Disparate Impact Is Cognizable*

Were claims of age-based disparate impact viable under the ADEA, the Court would still find in favor of the Secretary. This is because, contrary to Plaintiffs' assertion, the Secretary may not be entirely defenseless. Although the Supreme Court in *Meacham* held that "the business necessity test should have no place in ADEA disparate-impact cases," 554 U.S. at 97, the force of that pronouncement is uncertain in litigation under the ADEA federal-sector provision since *Meacham* involved a suit against a *private* employer. Further, a remark in *City of Jackson* that "*Wards Cove*'s pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA" suggests that federal employers could have at their disposal the business necessity defense, as it existed prior to 1991.[20] 544 U.S. at 240. The Court concludes that the Secretary would not have access to an RFOA defense but might be able to utilize the business necessity defense as conceptualized by *Wards Cove*, *i.e.*, a defense in which "the employer carries the burden of producing evidence of a business justification for his employment practice" but the "burden of persuasion . . . remains with the disparate-impact plaintiff." *Ward Cove*, 490 U.S. at 659. *City of Jackson* also noted that the business necessity defense is more demanding than a RFOA defense because it "asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class," which is not a requirement of the "reasonableness inquiry" called for by RFOA. 544 U.S. at 243.

In the alternative to its holding above, the Court thus considers whether the Secretary produced evidence of a business necessity to rebut the instant charges of disparate

---

[20] Congress amended Title VII but not the ADEA to overrule the holdings in *Wards Cove* regarding "the defendant's burden of proof and the plaintiff's burden of proving pretext." George Rutherglen, Major Issues in the Federal Law of Employment Discrimination 32 (Kris Markarian ed., 5th ed. 2012), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/empldis5.pdf/$file/empldis5.pdf.

impact age discrimination. Since the parties focused on an RFOA defense to the ADEA claim, which the Court finds is not available to the federal government, they did not expressly litigate whether a business necessity would succeed or fail in this part of the case. However, the parties fully litigated the Secretary's asserted business necessity defense in the context of Plaintiffs' Rehab Act claim and the Secretary's defense is the same as to both protected classes.

If a claim of age-based disparate impact were viable against the federal government, the Court concludes that the manner in which Plaintiffs have framed their Complaint would prove as fatal to that as it did to their claim of disparate impact under the Rehab Act. As already discussed, Plaintiffs challenge a policy preference: the decision to defund RSA regional offices and consolidate functions at headquarters to increase oversight and reduce costs as a matter of management philosophy. Plaintiffs' theory of disparate impact liability under the ADEA would not survive summary judgment in the face of the Secretary's business necessity defense for the reasons analyzed above.

The Court will grant the Secretary's motion for summary judgment as to Plaintiffs' ADEA claims premised on disparate impact liability.

## III. CONCLUSION

For the foregoing reasons, the Court will grant the Secretary's Motion for Partial Summary Judgment and deny Plaintiffs' Motion for Partial Summary Judgment. A memorializing Order accompanies this Memorandum Opinion.

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

Date: September 30, 2013

36